477 F.2d 1292
 23 A.L.R.Fed. 649
 Torbin H. BRENDEN, Individually and as parent and natural
guardian of Peggy Brenden, et al., Plaintiffs-Appellees,
v.
INDEPENDENT SCHOOL DISTRICT 742, and Independent School
District 274, Defendants, and the Minnesota State
High School League, Defendant-Appellant.
 No. 72-1287.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 8, 1973.
Decided April 18, 1973.
 
 Bernhard W. LeVander, Minneapolis, Minn., for defendant-appellant.
 Thomas W. Wexler, Minneapolis, Minn., for plaintiffs-appellees.
 Before LAY, HEANEY and STEPHENSON, Circuit Judges.
 HEANEY, Circuit Judge.
 
 
 1
 This is a civil rights action brought under 42 U.S.C. Sec. 1983 to enjoin enforcement of a rule promulgated by the Minnesota State High School League which bars females from participating with males in high school interscholastic athletics. The rule states:
 
 
 2
 "Girls shall be prohibited from participation in the boys' interscholastic athletic program either as a member of the boys' team or a member of the girls' team playing the boys' team.
 
 
 3
 "The girls' team shall not accept male members."
 
 
 4
 Minnesota State High School League Official Handbook, 1971-72.
 
 
 5
 Athletic Rules for Girls, Article III, Section 5.
 
 
 6
 The complaint charges that this rule discriminates against females in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.
 
 
 7
 The plaintiffs are Peggy Brenden and Antoinette St. Pierre, female high school students at Minnesota public high schools. Brenden attends the St. Cloud Technical High School in Independent School District 742 and St. Pierre attends Hopkins Eisenhower High School in Independent School District 274. Neither school district has appealed the judgment below. The defendant and sole appellant, the Minnesota State High School League, is a non-profit corporation which claims the membership of the state's 485 public high schools, including St. Cloud Technical High School and Hopkins Eisenhower High School.
 
 
 8
 The plaintiffs desired to participate in non-contact interscholastic sports: Brenden in tennis; St. Pierre in cross-country skiing and cross-country running. Neither of their schools provided teams for females in the respective sports. They did, however, provide such teams for males. Both plaintiffs would have liked to qualify for positions on the teams which have been established for males, but they were precluded from doing so on the basis of the above quoted rule. The trial court found that both were excellent athletes, and that neither would be damaged by competition with males.
 
 
 9
 The court, after a trial on the merits, granted relief stating:
 
 
 10
 "In summary, the Court is confronted with a situation where two high school girls wish to take part in certain interscholastic boys' athletics; where it is shown that the girls could compete effectively on those teams; and where there are no alternative competitive programs sponsored by their schools which would provide an equal opportunity for competition for these girls; and where the rule, in its application, becomes unreasonable in light of the objectives which the rule seeks to promote. Brought to its base, then, Peggy Brenden and Tony St. Pierre are being prevented from participating on the boys' interscholastic teams in tennis, cross-country, and cross-country skiing solely on the basis of the fact of sex and sex alone. The Court is thus of the opinion that in these factual circumstances, the application of the League rules to Peggy Brenden and Tony St. Pierre is arbitrary and unreasonable, in violation of the equal protection clause of the fourteenth amendment. For this reason, the application of the rule to these girls cannot stand. * * * To implement this decision, it is ordered.
 
 
 11
 "1. That Peggy Brenden and Tony St. Pierre be declared eligible to compete on their respective teams at their respective high schools.
 
 
 12
 "2. That the Minnesota State High School League is enjoined from imposing any sanctions upon either St. Cloud Technical High School or Hopkins Eisenhower High School for compliance with this Court order, and that no sanctions are to be imposed on any other public high schools for engaging in interscholastic competition with St. Cloud Technical High School and Hopkins Eisenhower High School."
 
 
 13
 Brenden v. Independent School District 742, 342 F.Supp. 1224, 1234 (D.Minn. 1972).
 
 
 14
 We affirm the decision of the trial court.
 
 
 15
 Having stated what this case is about, we would also like to emphasize what it is not about. First, because neither high school provided teams for females in the sports in which Brenden and St. Pierre desired to participate, we are not faced with the question of whether the schools can fulfill their responsibilities under the Equal Protection Clause by providing separate but equal facilities for females in interscholastic athletics. See generally, Note, Sex Discrimination in High School Athletics, 57 Minn.L.Rev. 339, 366-370 (1972). Second, because the sports in question are clearly noncontact sports, we need not determine if the High School League would be justified in precluding females from competing with males in contact sports such as football. See, Cynthia Morris et al., etc. v. Michigan State Board of Education et al., etc., 472 F.2d 1207 (6th Cir. 1973).
 
 
 16
 The High School League first contends that there is no jurisdiction over it under 42 U.S.C. Sec. 1983 because it is a voluntary organization not acting under the color of state law. However, the trial court specifically held that:
 
 
 17
 "* * * Although the Minnesota State High School League is a voluntary organization, the original allowance for public high schools to join such an association or organization is authorized pursuant to Minnesota law. Minn.Stat.Ann. Section 192.12. In addition, the rules governing League members are promulgated pursuant to a procedure which integrally involves the member school districts in the decision-making process. Beyond this, the ultimate enforcement of the rules becomes the responsibility of the member school and the public officials of those schools and school districts. In such a situation, where there is a tremendous public interest in educational functions, and where the public school machinery of the state is so involved in the effectuation and enforcement of rules which bind all public high schools in the state, the Court is left with no conclusion other than that defendant Minnesota State High School League and the defendant school districts are acting under color of state law. * * *" (Footnote omitted.)
 
 
 18
 342 F.Supp. at 1229.
 
 
 19
 We agree with the trial court and affirm its decision in this regard. See, Mitchell v. Louisiana High School Athletic Association, 430 F.2d 1155 (5th Cir. 1970); Louisiana High School Athletic Ass'n v. St. Augustine High Sch., 396 F.2d 224 (5th Cir. 1968); Oklahoma High School Athletic Association v. Bray, 321 F.2d 269 (10th Cir. 1963); Reed v. The Nebraska School Activities Association, 341 F.Supp. 258 (D.Neb. 1972); Sex Discrimination in High School Athletics, supra at 350.
 
 
 20
 We next turn to the merits. In evaluating a claim that state action violates the Equal Protection Clause, the following three criteria must be considered:
 
 
 21
 "* * * [I] the character of the classification in question; [II] the individual interests affected by the classification; [III] and the governmental interests asserted in support of the classification. * * *"
 
 
 22
 Dunn v. Blumstein, 405 U.S. 330, 335, 92 S.Ct. 995, 999, 31 L.Ed.2d 274, 280 (1972).
 
 
 23
 I. Sex-Based Classifications.
 
 
 24
 In 1961, President Kennedy, having found that "prejudices and outmoded customs act as barriers to the full realization of women's basic rights," established the President's Commission on the Status of Women. Executive Order 10980 (December 14, 1961). That Commission, the President's Task Force on Women's Rights and Responsibilities, congressional hearings and critical studies have confirmed the serious nature of discrimination on account of sex.[1]
 
 
 25
 In recent years, Congress and the Executive have acted to eliminate discrimination based on " 'stereotyped characterizations of the sexes'," Phillips v. Marietta Corp., 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971) (Marshall, J., concurring). See, Title VII of the Civil Rights Act of 1964,[2] the Equal Pay Act,[3] and Title IX of the Education Amendments of 1972.[4] The jurisdiction of the Civil Rights Commission has been extended to include discrimination on the basis of sex.[5] Finally, Congress has passed the Equal Rights Amendment and transmitted it to the states.
 
 
 26
 In recent years, courts, too, have become sensitive to the problems of sex-based discrimination. In 1963, the Presidential Commission on the Status of Women recommended that:
 
 
 27
 "Early and definitive court pronouncement, particularly by the United States Supreme Court, is urgently needed with regard to the validity under the Fifth and Fourteenth Amendments of laws and official practices discriminating against women, to the end that the principle of equality becomes firmly established in constitutional doctrine."
 
 
 28
 There is no longer any doubt that sex-based classifications are subject to scrutiny by the courts under the Equal Protection Clause and will be struck down when they provide dissimilar treatment for men and women who are similarly situated with respect to the object of the classification. Reed v. Reed, 404 U.S. 71, 77, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). See, Moritz v. C.I.R., 469 F.2d 466 (10th Cir. 1972). Compare, Green v. Waterford Board of Education, 473 F.2d 629 (2nd Cir. 1973), and LaFleur v. Cleveland Board of Education, 465 F.2d 1184 (6th Cir. 1972), with Mrs. Susan Cohen v. Chesterfield County School Board et al., etc., 474 F.2d 395 (4th Cir. 1973) (en banc). Furthermore, discrimination on the basis of sex can no longer be justified by reliance on "outdated images * * * of women as peculiarly delicate and impressionable creatures in need of protection from the rough and tumble of unvarnished humanity." Seidenberg v. McSorleys' Old Ale House, Inc., 317 F.Supp. 593, 606 (S.D.N.Y. 1970).
 
 
 29
 In Sail'er Inn v. Kirby, 5 Cal.3d 1, 95 Cal.Rptr. 329, 340, 485 P.2d 529, 540541 (Cal.1971) (en banc), the unanimous California Supreme Court succinctly summarized the nature of sexbased discrimination:
 
 
 30
 "Sex, like race and lineage, is an immutable trait, a status into which the class members are locked by the accident of birth. What differentiates sex from nonsuspect statuses, such as intelligence or physical disability, and aligns it with the recognized suspect classifications is that the characteristic frequently bears no relation to ability to perform or contribute to society. * * * The result is that the whole class is relegated to an inferior legal status without regard to the capabilities or characteristics of its individual members. * * * Where the relation between characteristic and evil to be prevented is so tenuous, courts must look closely at classifications based on that characteristic lest outdated social stereotypes result in invidious laws or practices.
 
 
 31
 "Another characteristic which underlies all suspect classifications is the stigma of inferiority and second class citizenship associated with them. * * * Women, like Negroes, aliens, and the poor have historically labored under severe legal and social disabilities. Like black citizens, they were, for many years, denied the right to vote and, until recently, the right to serve on juries in many states. They are excluded from or discriminated against in employment and educational opportunities. Married women in particular have been treated as inferior persons in numerous laws relating to property and independent business ownership and the right to make contracts.
 
 
 32
 "Laws which disable women from full participation in the political, business and economic arenas are often characterized as 'protective' and beneficial. Those same laws applied to racial or ethnic minorities would readily be recognized as invidious and impermissible. The pedestal upon which women have been placed has all too often, upon closer inspection, been revealed as a cage." (Citations and footnotes omitted.)
 
 
 33
 In this case, it is unnecessary for this Court to determine whether classifications based on sex are suspect and, thus, can be justified only by a compelling state interest because the High School League's rule cannot be justified even under the standard applied to test nonsuspect classifications. See, Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349, 359 n. 8 (1972).
 
 
 34
 II. The Plaintiffs' Interest in Interscholastic Athletics.
 
 
 35
 The High School League contends that relief under the Civil Rights Act is inappropriate because participation in interscholastic sports is a privilege and not a right. We disagree. The Supreme Court has rejected "the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege.' * * *". Graham v. Richardson, 403 U.S. 365, 374, 91 S.Ct. 1848, 1853, 29 L. Ed.2d 534 (1971). The question in this case is not whether the plaintiffs have an absolute right to participate in interscholastic athletics, but whether the plaintiffs can be denied the benefits of activities provided by the state for male students. See, Reed v. The Nebraska School Activities Association, supra, 341 F.Supp. at 262.
 
 
 36
 Discrimination in education has been recognized as a matter of the utmost importance. The Supreme Court has pointed out that:
 
 
 37
 "Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education in our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms."
 
 
 38
 Brown v. Board of Education of Topeka, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). In particular, "[d]iscrimination in education is one of the most damaging injustices women suffer. It denies them equal education and equal employment opportunity, contributing to a second class self image." A Matter of Simple Justice, The Report on the President's Task Force on Women's Rights and Responsibilities 7 (April, 1970). See, American Women, The Report of the President's Commission on the Status of Women (1963).[6] The President's Task Force also concluded that "discrimination based on sex in public education should be prohibited by the Fourteenth Amendment." A Matter of Simple Justice, supra at 8. Congress has also recognized the importance of all aspects of education for women by declaring:
 
 
 39
 "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, * * *."
 
 
 40
 Title IX of the Education Amendments of 1972, 86 Stat. 235, Sec. 901(a), P.L. 92-318 (June 23, 1972) U.S.Code Cong. & Admin.News p. 444.
 
 
 41
 Discrimination in high school interscholastic athletics constitutes discrimination in education. The Supreme Court of Minnesota has stated that:
 
 
 42
 "* * * [I]nterscholastic activities * * * [are] today recognized * * * as an important and integral facet of the * * * education process, see, Bunger v. Iowa High School Athletic Assn, 197 N.W.2d 555 (Iowa 1972); Kelley v. Metropolitan County Bd. of Ed. of Nashville and Davidson County, 293 F.Supp. 485 (M.D.Tenn. 1968) * * *."
 
 
 43
 Thompson v. Barnes, 200 N.W.2d 921, 926 n. 11 (Minn.1972). The court in Thompson pointed out that this was also the position of the Minnesota High School League. See, Behagen v. Intercollegiate Conference of Faculty Rep., 346 F.Supp. 602 (D.Minn.1972). The National Federation of State High School Athletic Associations has taken the position that:
 
 
 44
 "Interscholastic athletics shall be an integral part of the total secondary school educational program that has as its purpose to provide educational experiences not otherwise provided in the curriculum, which will develop learning outcomes in the areas of knowledge, skills and emotional patterns and will contribute to the development of better citizens. Emphasis shall be upon teaching 'through' athletics in addition to teaching the 'skills' of athletics."
 
 
 45
 1970-1971 National Federation of State High School Athletic Associations Official Handbook 9.
 
 
 46
 Furthermore, the High School League recognizes that interscholastic sports are just as valuable for females as for males. See, Haas v. South Bend Community School Corporation, 289 N.E.2d 495, 500 (Ind.1972).
 
 
 47
 The importance of interscholastic athletics for females as part of the total educational process has been recently emphasized by the Minnesota State Board of Education. Its recent statement of policy and proposed action, Eliminating Sex Bias in Education (September 1972), states that:
 
 
 48
 "* * * [O]ur educational system has helped perpetuate the division of the sexes into predetermined roles and has failed to provide freedom from discrimination because of sex * * *
 
 
 49
 "The practice of stereotyping and socializing men and women into 'masculine' 'feminine' roles has resulted in prejudice, dominance, discrimination and segregation harmful to the human development of both sexes.
 
 
 50
 ******
 
 
 51
 * * *
 
 
 52
 "The State Board of Education is concerned about four areas in particular: discrimination in hiring and promoting, sex requirements for boys and girls to participate in sports and extra-curricular activities, sex bias in curricular and teaching materials, and providing in-service training for administrators and teachers to overcome the habits and practices of teaching stereotyped social roles." (Emphasis added.)
 
 
 53
 In view of these circumstances, we must conclude that at the very least, the plaintiffs' interest in participating in interscholastic sports is a substantial and cognizable one. Thus, this case is properly before a federal court to determine if the High School League's actions are in conformity with the Equal Protection Clause. See, Cynthia Morris et al., etc. v. Michigan State Board of Education, supra; Mitchell v. Louisiana High School Athletic Association, supra, 430 F.2d at 1158; Bucha v. Illinois High School Athletic Association, 351 F.Supp. 69 (N.D.Ill.1972); Reed v. The Nebraska School Activities Association, supra; Graves v. Walton County Board of Education, 300 F.Supp. 188, 199 (M. D.Ga.1968), aff'd, 410 F.2d 1152, 1153 (5th Cir. 1969). See generally, 36 Mo. L.Rev. 406-408 (1971).
 
 
 54
 III. The High School League's Interest.
 
 
 55
 Because the defendant high schools have not provided teams for females in tennis and cross-country skiing and running, the effect of the High School League's rule is to completely bar Brenden and St. Pierre from competition in these non-contact interscholastic sports, despite their being fully qualified. The High School League argues, however, that its rule is justified in order to assure that persons with similar qualifications compete among themselves. They state that physiological differences between males and females make it impossible for the latter to equitably compete with males in athletic competition.[7]
 
 
 56
 In evaluating the High School League's justification for their rule, we will, as we have indicated, apply the equal protection standard for evaluating non-suspect classifications. That standard is set forth in Reed v. Reed, supra 404 U.S. at 76, 92 S.Ct. at 254.
 
 
 57
 "* * * A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons in similar circumstances shall be treated alike.' * * *" (Citation omitted and emphasis added.)It has been pointed out that in applying this standard, the Supreme Court's definition of what constitutes a rational relationship has become more rigorous, and that the Court has become "less willing to speculate as to what unexpressed legitimate state purposes may be rationally furthered by a challenged statutory classification." Green v. Waterford Board of Education, supra, 473 F.2d at 633.
 
 
 58
 We recognize that because sexbased classifications may be based on outdated stereotypes of the nature of males and females, courts must be particularly sensitive to the possibility of invidious discrimination in evaluating them, and must be particularly demanding in ascertaining whether the state has demonstrated a substantial rational basis for the classification. Compare, Reed v. Reed, supra, with Gunther, The Supreme Court, 1971 Term-Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1, 34 (1972). See, Wark v. Robbins, 458 F.2d 1295, 1297 n. 4 (1st Cir. 1972); Sex Discrimination in High School Athletics, supra at 346-349, 370. This is especially true where the classification involves the interest of females in securing an education.
 
 
 59
 We believe that in view of the nature of the classification and the important interests of the plaintiffs involved, the High School League has failed to demonstrate that the sex-based classification fairly and substantially promotes the purposes of the League's rule.
 
 
 60
 (A)
 
 
 61
 First, we do not believe the High School League has demonstrated a sufficient rational basis for their conclusion that women are incapable of competing with men in non-contact sports. The trial court specifically found that the plaintiffs were capable of such competition and the evidence indicates that the class of women, like the class of men, includes individuals with widely different athletic abilities. As the Fifth Circuit has recognized in activities requiring physical strength, technique may be just as important as physical capacity. Weeks v. Southern Bell Telephone Company, 408 F.2d 228, 236 (5th Cir. 1969). And, "[t]echnique is hardly a function of sex." Ibid. at 236. Furthermore, the record indicates that in non-contact sports, such as those involved here, factors such as coordination, concentration, agility and timing play a large role in achieving success. No objective evidence was introduced comparing males and females with respect to these factors. See, Sex Discrimination in High School Athletics, supra at 363.
 
 
 62
 Essentially, the testimony of those witnesses who concluded that females were wholly incapable of competing with men in interscholastic athletics was based on subjective conclusions drawn from the physiological difference between the sexes by individuals who were not themselves familiar with mixed competition. This subjective testimony is particularly susceptible to discrimination based on stereotyped notions about the nature of the sexes.
 
 
 63
 Furthermore, the High School League failed to show that it had established any objective nondiscriminatory minimum standards for evaluating qualifications for non-contact interscholastic athletics. The record indicates, in fact, that the schools had adopted no cut policies allowing male students, no matter how untalented, to participate in the non-contact interscholastic sports involved here.
 
 
 64
 We note that there is at least one systematic study of mixed competition in non-contact sports. In 1969, a rule of the New York State Department of Education prohibiting competition between males and females in non-contact sports was challenged. The Department reports:
 
 
 65
 "Faced with the need for valid supporting data, the Education Department gathered all the evidence it could find on the matter Very little was reported in professional literature. In the limited number of experiences that came to its attention wherein girls competed on boys' teams (primarily at the college level), the only negative factor reported was that it was not yet socially acceptable for a girl to defeat a boy in athletic competition. Discussion with various medical personnel elicited a unanimous expression that there are no medical reasons to prohibit girls from competing on boys' teams in selected non-contact sports. Thus, it became clear that the Department had little or nothing to support its traditional position. It was then suggested that a moratorium be declared on a decision until some evidence could be gathered through experience. Thus, the experimental project came into being."
 
 
 66
 University of the State of New York, The State Department of Education, Division of Health, Physical Education and Recreation, Report on Experiment: Girls on Boys Interscholastic Athletic Teams, March 1969-June 1970, 1 (February, 1972).
 
 
 67
 The Department then conducted an experiment in which one hundred schools over a sixteen-month period maintained athletic teams on which both males and females participated. The results of the experiment were overwhelmingly favorable to continuing mixed competition:
 
 
 68
 "Should the practice of allowing girls to compete on boys' athletic teams be continued? Eighty percent of the principals, directors, women physical educators, coaches, and physicians involved in the experiment voted in favor of continuing the practice, either as an experiment or as legal policy. Slightly more than 90 percent of the boy team members, girl participants, parents, coaches and opposing coaches also favored continuation of the practice. * * *"
 
 
 69
 Id. at 4. As a result of the experiment, New York amended its rules to allow females to compete with males.[8]
 
 
 70
 (B)
 
 
 71
 Second, even if we assume, arguendo, that, on the whole, females are unlikely to be able to compete with males in non-contact interscholastic sports, this fact alone would not justify precluding qualified females like Brenden and St. Pierre from such competition. Reed v. Reed, supra. Cf., Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).
 
 
 72
 In Reed, the Court found unconstitutional a portion of the Idaho probate code which granted males a mandatory preference over females in competing for the right to administer an estate without regard for the individual qualifications of the female applicant. One of the reasons which the Idaho Supreme Court gave for upholding the statute was that the "legislature when it enacted the statute evidently concluded that in general men are better qualified to act as an administrator than are women." Reed v. Reed, 465 P.2d 635, 638 (Idaho 1970). Because of this, in the Idaho Supreme Court's opinion, eliminating females from consideration "is neither an illogical or arbitrary method devised by the legislature to resolve an issue that would otherwise require a hearing as to the relative merits * * * of the two or more petitioning relatives." Id. at 638.
 
 
 73
 The United States Supreme Court did not discuss the validity of the assumption that women are less qualified than men to be administrators of estates. Nonetheless, it concluded that the preference for men was arbitrary:
 
 
 74
 "* * * To give a mandatory preference to members of either sex over members of the other, merely to accomplish the elimination of hearings on the merits, is to make the very kind of arbitrary legislative choice forbidden by the Equal Protection Clause of the Fourteenth Amendment; * * *
 
 
 75
 "By providing dissimilar treatment for men and women who are * * * similarly situated, the challenged section violates the Equal Protection Clause. * * *"
 
 
 76
 Reed v. Reed, supra 404 U.S. at 76-77, 92 S.Ct. at 254.
 
 
 77
 In our view, Reed precludes a state from using assumptions about the nature of females as a class, to deny to females an individualized determination of their qualifications for a benefit provided by the state.
 
 
 78
 In the present case, the underlying purpose of the High School League's rule is, as we have indicated, to insure that persons with similar qualifications will compete with each other. Yet, females, whatever their qualifications, have been barred from competition with males on the basis of an assumption about the qualifications of women as a class. The failure to provide the plaintiffs with an individualized determination of their own ability to qualify for positions on these teams is, under Reed, violative of the Equal Protection Clause. See, Note, Sex Discrimination in High School Athletics, supra.[9]
 
 
 79
 The High School League argues that invalidation of its rule will have an adverse impact on the future development of opportunities for females in interscholastic sports. This argument is too speculative to have merit, particularly in view of the recent statement of the Minnesota State Board of Education calling on its local boards to provide equal education opportunity for females, see, Eliminating Sex Bias in Education, supra, and the League's own stated commitment to interscholastic athletics for females. This argument certainly cannot be used to deprive Brenden and St. Pierre of their rights to equal protection of the law. With respect to these two females, the record is clear. Their schools have failed to provide them with opportunities for interscholastic competition equal to those provided for males with similar athletic qualifications. Accordingly, they are entitled to relief. See, Haas v. South Bend Community School Corporation, supra.
 
 
 80
 We are, of course, always reluctant to invalidate state and local action as unconstitutional. We have, however, no choice where a group of citizens has been deprived of the equal protection of the law. The likelihood of similar state action in this area being found unconstitutional in the future will be minimized if the League and the local school board affirmatively respond to the request of the Minnesota Department of Education to:
 
 
 81
 "* * * Review all State Board rules and regulations and take steps to eliminate all sex-based requirements for courses and extra-curricular activities for students.
 
 
 82
 "[And] * * * Provide equal access for all pupils to local school facilities, programs, equipment, staff services, and financial resources."
 
 
 83
 Eliminating Sex Bias in Education, supra at 6.
 
 
 84
 Affirmed.
 
 
 
 [1]
 See, American Women, The Report of the President's Commission on the Status of Women (1963); A Matter of Simple Justice, The Report on the President's Task Force on Women's Rights and Responsibilities (April, 1970); Discrimination Against Women, Hearings Before the Special Subcommittee on Education of the Committee on Education & Labor, House of Representatives, 91st Cong., 2nd Sess., on Section 805 of H.R. 16048 (1970); L. Kanowitz, Women and the Law (1964); 1969 Handbook on Women Workers, United States Department of Labor, Women's Bureau Bulletin 294
 
 
 [2]
 42 U.S.C. Sec. 2000e, et seq
 
 
 [3]
 29 U.S.C. Sec. 206(d)
 
 
 [4]
 Sections 901-907, P.L. 92-318, 86 Stat. 235 (June 23, 1972)
 
 
 [5]
 Section 3, P.L. 92-496, 86 Stat. 813 (October 14, 1972)
 
 
 [6]
 The failure to provide educational opportunity for women has long been criticized in this country. For instance, Abigail Adams, writing in revolutionary war America, "spoke often and sometimes sharply in her letters about the discrimination between boys and girls with respect to educational privileges, a disparity she could only attribute to men's 'ungenerous jealousy of rivals near the throne'." Quoted in James & James & Boyer, Notable American Women 1607-1950: A Biographical Dictionary (1971)
 
 
 [7]
 "* * * As testified to by defendants' expert witnesses, men are taller than women, stronger than women by reason of a greater muscle mass; have larger hearts than women and a deeper breathing capacity, enabling them to utilize oxygen more efficiently than women, run faster, based upon the construction of the pelvic area, which when women reach puberty, widens, causing the femur to bend outward, rendering the female incapable of running as efficiently as a male. * * *"
 Brenden v. Independent School District 742, 342 F.Supp. 1224, 1233 (D.Minn. 1972).
 
 
 [8]
 New York has determined that:
 "(4) Girls may participate on the same team with boys in interscholastic competition in the sports of archery, badminton, bowling, fencing, golf, gymnastics, riflery, rowing (but only as coxswain), shuffleboard, skiing, swimming and diving, table tennis, tennis, and track and field, provided the school attended by a girl wishing to participate in any such sport does not maintain a girls' team in that sport. In exceptional cases, the principal or the chief executive officer of a school may permit a girl or girls to participate on a boys' team in a designated sport or sports, notwithstanding the fact that the school maintains a girls' team in that sport or sports."
 Section 135.4 of the Regulations of the Commissioner of Education.
 New York is not alone in having concluded that mixed competition is feasible. A new Michigan statute states:
 "Female pupils shall be permitted to participate in all noncontact interscholastic athletic activities, including but not limited to archery, badminton, bowling, fencing, golf, gymnastics, riflery, shuffleboard, skiing, swimming, diving, table tennis, track and field and tennis. Even if the institution does have a girls' team in any noncontact interscholastic athletic activity, the female shall be permitted to compete for a position on the boys' team. Nothing in this subsection shall be construed to prevent or interfere with the selection of competing teams solely on the basis of athletic ability."
 M.C.L.A. 340.379(2), Pub.Act No. 138 (Mich. May 22, 1972).
 Even in Minnesota, mixed competition exists in St. Paul pursuant to an exemption from the usual League rule. See, Brenden v. Independent School District 742, supra 342 F.Supp. at 1234 n. 17.
 In addition, recently groups such as the National Collegiate Athletic Association and the Big Eight Athletic Conference have eliminated provisions in their rules which prohibited females from competing in interscholastic activities with men.
 
 
 [9]
 The District Courts are divided on the question of whether rules such as that promulgated by the Minnesota High School League are constitutional. These cases are listed and discussed in some detail in Note, Sex Discrimination in High School Athletics, 57 Minn.L.Rev. 339 (1972)