127 N.J. Super. 522 (1974)
318 A.2d 33
NATIONAL ORGANIZATION FOR WOMEN, ESSEX COUNTY CHAPTER, JUDITH S. WEISS, PRESIDENT; GILBERT H. FRANCIS, DIRECTOR, DIVISION ON CIVIL RIGHTS, COMPLAINANTS-RESPONDENTS,
v.
LITTLE LEAGUE BASEBALL, INC., RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 25, 1974.
Decided March 29, 1974.
*526 Before Judges CONFORD, HANDLER and MEANOR.
Mr. Michael D. Loprete argued the cause for appellant (Messrs. Mattson, Madden, Polito & Loprete, attorneys).
Mr. Bertram P. Goltz, Jr., Deputy Attorney General, argued the cause for Director, Division on Civil Rights (Mr. William F. Hyland, Attorney General of New Jersey [Mr. George F. Kugler, Jr., former Attorney General of New Jersey], attorney).
Ms. Nadine Taub filed a brief on behalf of amici curiae Women's Rights in Tenafly and eight named girls aged 8 to 12 (Ms. Phoebe Seham, attorney).
The opinion of the court was delivered by CONFORD, P.J.A.D.
This is an appeal from an order and an amended order of the Division on Civil Rights, entered on a report, findings and recommendations by Sylvia B. Pressler, hearing officer, adopted by the Director of the Division, ordering Little League Baseball, Inc. ("Little League") and all local baseball leagues chartered by it in this State to admit girls aged 8 to 12 to participation in their baseball programs conducted in this State. These programs have heretofore been maintained solely for boys. The Division acted on a complaint of violation of the Law Against Discrimination, N.J.S.A. 10:5-1 et seq., and particularly section 10:5-12(f). That provision prohibits the denial by the operator of any "place of public accommodation" of any of its "accommodations, advantages, facilities or privileges" on account of "race, creed, color, national origin, ancestry, marital status or sex" (emphasis added), except, in the case of sex, where the place of public accommodation "is in its nature reasonably restricted exclusively to individuals of one sex" (with a specification of a number of nonexclusive examples, discussed later in this opinion).
*527 The gist of the defense by Little League of the sex requirement at the hearing in the Division was that because of physical differences between the sexes girls as a class were more likely to be injured in the game, which is played with a hard ball, than boys. Much expert evidence was introduced on both sides of this question. The hearing officer held that "by a heavy preponderance of the evidence" Little League had not borne its burden of establishing that girls of 8 to 12 are so physiologically inferior to boys of the same age group as to preclude them as a class from competing as safely and successfully as boys in the game.
In their objections to the hearing officer's report and findings and on this appeal Little League has made the additional contentions: (1) the Supremacy Clause of the Federal Constitution and principles of federal preemption preclude the action of the Division because Little League is chartered under an act of Congress which restricts its activities to boys; (2) Little League is not a "place of public accommodation," and (3) Little League in its nature is reasonably restricted to boys (aside from the matter of susceptibility to injury), within the intent of N.J.S.A. 10:5-12(f).

I
Dr. Creighton J. Hale, executive vice-president of Little League and its director of research, a qualified physiologist, gave testimony that in respect of comparative bone strength, muscle strength and reaction time girls were inferior to boys and that therefore their potentiality for injury during a baseball game with boys was enhanced above the hazard of injury of boys. The evidence as to strength of bones was based upon extrapolation from Japanese studies of cadaver bones of persons between 18 and 80 years of age. The State's expert witness, Dr. Torg, a specialist in pediatric orthopedics, rejected Dr. Hale's conclusions with regard to bone strength as based on unwarranted data. He also noted that between the ages of 8 and 10 the weight and height of the sexes is *528 about the same and that girls from 10 to 12 generally surpass boys in these respects.
While expert witnesses on both sides agreed that boys' "reaction time" is slightly faster than that of girls, the State's expert, Dr. Hohmuth, felt that the more relevant interval in relation to safety was "choice reaction time"  the period between stimulus and exercise of judgment as to a course of action. He testified that standard studies in the field showed no consistent differences in this regard prior to adolescence. However, he was dubious whether laboratory experiments on these subjects had much weight in predicting results in actual play.
Dr. Hale testified that boys are stronger than girls because their muscles have more fibers. Dr. Torg agreed, but concluded that other factors were more important than strength in playing the game safely  "general systemic physiologic maturation" (in which girls 8 to 12 are ahead) and training, experience, motivation, nutrition and home environment.
Dr. Hale acknowledged that some girls would have the skill to play baseball with boys, and he testified that Little League has various leagues graded according to the ability of the player, so that girls could be rated to play with their peers of either sex. He was nevertheless concerned that the less-skilled girls would be more apt to suffer injury even when playing with less-skilled boys. Dr. Torg, on the other hand, concluded that there was a significant proportion of girls from 8 to 12 capable from a physical standpoint of participating in Little League baseball and that there were some children of both sexes who should be excluded for physiological reasons. He also was of the opinion that a female who demonstrated skills comparable to a male on the Little League tryouts should be allowed to participate. He cautioned, however, that at the age of 13 the situation and his opinion begin to change.[1]
*529 Dr. Hale asserted that a blow to the breast of a female, as by a batted or thrown ball, can cause cancer, and Dr. Torg took the opposite position; however, neither was able to establish a firm basis for his conclusion.
There was opposing psychological testimony. A Little League expert testified that children of each sex need occasional "islands of privateness" during which they can be alone with others of their own sex, and that Little League can serve this purpose for boys, and softball competition for girls. (It appears to be agreed there is no organized hardball competition available for girls alone). The State's psychiatric expert disagreed with the need for sex-segregated activities at the age level of 8-12. He thought that sex-integrated baseball would contribute to the mental health of children of both sexes.
The hearing officer's detailed findings of fact were consistently in accord with the conclusions of the State's experts on all material points of disagreement on the issues of safety and skill. She was dubious as to the relevance of the psychological testimony. If material, she expressed accord with the view of the state expert.
We conclude there was substantial credible evidence in the record to permit the Division to find as a fact that girls of ages 8-12 are not as a class subject to a materially greater hazard of injury while playing baseball than boys of that age group. We will therefore not disturb that finding of the administrative agency. Close v. Kordulak Bros., 44 N.J. 589, 599 (1965). Thus the factor of safety does not militate for a determination that the nature of Little League baseball reasonably restricts participation in it at the 8-12 age level to boys. We regard the psychological testimony on both sides *530 as too speculative to rest any fact-finding on it. In any case, we are clear that there is no substantial psychological basis in the record to warrant a conclusion that the game is reasonably restricted to boys in this age bracket, as against the evident statutory policy against sex discrimination in places of public accommodation.

II
Little League asserts it is not a "place of public accommodation" within the meaning of the statute, primarily because it is a membership organization which does not operate from any fixed parcel of real estate in New Jersey of which it had exclusive possession by ownership or lease. The hearing officer, in arriving at a contrary conclusion, held that the hallmark of a place of public accommodation was that "the public at large is invited," and she found that Little League issued an invitation to all boys in communities having local leagues. She found, further, that membership organizations, although not having a "specific pinpointable geographic area," are nevertheless places of public accommodation if, as Little League does, they offer advantages and facilities on the basis of a general, public invitation to join.
We are satisfied that the determination of the Division on this issue is correct. The law is remedial and should be read with an approach sympathetic to its objectives. See Levitt & Sons, Inc. v. Div. Against Discrimination, etc., 31 N.J. 514, 524 (1960); Zahorian v. Russell Fitt Real Estate Agency, 62 N.J. 399, 409 (1973). Moreover, we are "warranted in placing considerable weight on the construction of the statute * * * by the administrative agency charged by the statute with the responsibility of making it work." Passaic Daily News v. Blair, 63 N.J. 474, 484 (1973). If this organization were not deemed a place of public accommodation it would be free to discriminate on the basis of race or religion as well as sex.
*531 The statutory noun "place" (of public accommodation) is a term of convenience, not of limitation. It is employed to reflect the fact that public accommodations are commonly provided at fixed "places", e.g., hotels, restaurants, swimming pools, etc. But a public conveyance, like a train, is a "place" of public accommodation although it has a moving situs. See N.J.S.A. 10:5-5(l), ("public conveyance"). The "place" of public accommodation in the case of Little League is obviously the ball field at which tryouts are arranged, instructions given, practices held and games played. The statutory "accommodations, advantages, facilities and privileges" at the place of public accommodation, N.J.S.A. 10:5-12(f), is the entire agglomeration of the arrangements which Little League and its local chartered leagues make and the facilities they provide for the playing of baseball by the children. In Fraser v. Robin Dee Day Camp, 44 N.J. 480 (1965), the court held that day camps were places of public accommodation even before the statute listed them as such. The court noted that many of the specifically listed types of public accommodation were "educational or recreational" in nature (Id. at 487), as were day camps. The same, of course, is true of Little League baseball. As to the educational nature of competitive athletics, see Brenden v. Independent School District 742, 477 F.2d 1292, 1298 (8 Cir.1973).
Little League is a public accommodation because the invitation is open to children in the community at large, with no restriction (other than sex) whatever. See Clover Hill Swimming Club v. Goldsboro, 47 N.J. 25, 33 (1966). It is public in the added sense that local governmental bodies characteristically make the playing areas available to the local leagues, ordinarily without charge.
Finally, we discern nothing in the statute or its underlying purposes to persuade us that what would otherwise be a place of public accommodation is any less so because its management and sponsorship is by a nonprofit or membership organization rather than a commercial enterprise, or because *532 it does not have exclusive use or possession of the site of its operations. Note the many "nonprofit" types of institutions specified as places of public accommodation in N.J.S.A. 10:5-5(l).

III
The issue which constitutes the most substantial question before us is whether Little League has shown that it comes within the statutory exclusion for a place of public accommodation "which is in its nature reasonably restricted exclusively to individuals of one sex." Appellant points to the statutory language quoted and to the accompanying specific exemptions: "and which shall include but not be limited to any summer camp, day camp or resort camp, bathhouse, dressing room, swimming pool, gymnasium, comfort station, dispensary, clinic or hospital, or school or educational institution which is restricted exclusively to individuals of one sex." N.J.S.A. 10:5-12(f). It argues that five of these specific exceptions involve athletics, and thus illuminate a legislative intent that any place of public accommodation related to athletic activities is intended to be permitted to be restricted to one sex.
The contention is not at all persuasive. Practically all of the 13 types of facility mentioned have the common characteristic of requiring, or being related to occasions for, a changing or doffing of clothing, or performance of bodily functions, thus involving an exposure of the body. We thereby infer a legislative intent that facilities or activities which may to a significant degree involve at times an occasion for breach of bodily privacy may reasonably be confined to one sex, even though in other respects classifiable as a place of public accommodation. It is apparent that this criterion does not apply to Little League, since, as we understand it, changing of clothing for play or after play invariably takes place at home. We perceive no significant hazard of breach of bodily privacy in the context of bisexual Little League baseball, and *533 none has been argued by Little League in its brief or in the Division. The suggestion that such a hazard is presented when a male coach gives first aid to an injured girl player appears to border on the frivolous.
We do not, however, imply any present view that only in the area of bodily privacy does the statute contemplate that the "nature" of the place of public accommodation may reasonably justify its restriction to one sex. We have no occasion here to appraise the full reach of the exception. But we find none of the other bases for such a restriction advanced by Little League in this case to be persuasive.
It is first argued that after puberty girls cannot successfully compete with boys at baseball and, in fact, do not noticeably engage in it. Boys, on the other hand, frequently continue with baseball into adolescence and maturity. Therefore, it is argued, it is reasonable for Little League to expend its resources solely on children (boys) who will use the training to develop permanent baseball skills as against those who will not. The criterion of reasonableness in this regard, it seems to us, must be sought in the underlying purposes of sex discrimination legislation as a current social phenomenon. As we see it, these are mainly to emancipate the female sex from stereotyped conceptions as to its limitations embedded in our mores but discordant with current rational views as to the needs, capabilities and aspirations of the female, child or woman. Cf. Passaic Daily News v. Blair, supra, 63 N.J. at 483; see Brenden v. Independent School District 742, supra, 477 F.2d at 1296-1297.
In the foregoing light we think it is not reasonable to deprive girls of 8 to 12 who, with the permission of their parents, can and want to play hard-ball baseball, of access to the only large-scale, generally available means for enjoyment of the activity by children of that age, merely because they may not have the occasion to play the game after age 12. Moreover, there is nothing of substance in the record to justify any finding that the baseball training of the boys will suffer from admission to the competition of girls.
*534 Little League also points to the vaunted aims of the organization, mentioned in its federal charter, of development in children of "qualities of citizenship, sportsmanship, and manhood," and it implies these objectives will be impaired, in the case of the boys, by admission of girls to the activity. We are quite unable to understand how these conclusions are arrived at. Moreover, assuming "manhood" in the sense of the charter, means basically maturity of character, just as does "womanhood," we fail to discern how and why little girls are not as appropriate prospects for learning citizenship and sportsmanship, and developing character, as are boys.
In sum, we find no basis in anything argued by Little League to support a determination that, consistent with the underlying purpose of the statutory prohibition against denial of the facilities of places of public accommodation on account of sex, Little League by virtue of its nature may reasonably be permitted to be restricted to boys in the age category under consideration.
In so holding we note the justified characterization by the hearing officer of Little League as a "piece of public Americana." It has become synonymous with children's baseball  a sport which the Little League handbook proudly proclaims as America's national game. The record evidences the fact that substantial numbers of young girls want to partake in it and are qualified to do so competitively with boys of the same age. The logic of the statutory support for their aspirations is compelling.

IV
Little League argues that the Division's order and its federal charter of incorporation are in direct conflict and that Congress has articulated a national policy that "nonadult males can voluntarily associate in exclusive organizations"  a policy which preempts the order at issue here.
The first phase of the argument rests on the premise that Congress, in granting the federal charter of incorporation, specifically intended that the participants in Little *535 League baseball would be boys only. The purpose clause of this charter[2] and the relevant statutory history[3] do show that Congress contemplated participation only by boys; however, they do not show that a limitation exclusively to boys was an avowed congressional objective.
The second argument  that Congress has articulated a national policy preempting the Division's order  rests on the fact that Congress has granted, in addition to the Little League charter, charters of incorporation to three other national organizations each of which state that the objective is to assist boys in one way or another. These organizations are Boy Scouts of America, 36 U.S.C.A. §§ 21-29 (1916), § 23; Boys' Club of America, 36 U.S.C.A. §§ 691-707 (1956), § 693; and Big Brothers of America, *536 36 U.S.C.A. §§ 881-898 (1958), § 883. The argument is that all these charters represent a "consistent course of legislation adhering to the basic tenet that rewards in character development can be realized by boys belonging to well-defined, limited activity associations for boys [which] establishes a national policy to permit such associations" (emphasis added). It is of interest that Title 36 of the United States Code is entitled, "Patriotic Societies and Observances."
Perez v. Campbell, 402 U.S. 637, 644, 91 S.Ct. 1704, 1708, 29 L.Ed.2d 233 (1971), explains that "[d]eciding whether a state statute is in conflict with a federal statute and hence invalid under the Supremacy Clause is essentially a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question whether they are in conflict." As noted above, however, the purpose clause of the Little League charter does not signify a congressional policy decision that only boys should play baseball. The statute rather represents only a determination that Little League Baseball, Inc., such as it is, should have a national charter. The Senate Report on the charter bill indicates that the incorporation was for the limited purpose of constituting "an appropriate recognition of the national stature which Little League has attained" (see note 3). Moreover, the ascription of any purpose or policy beyond the mere grant of a federal charter would be incompatible with Congress' limited power to create corporations.[4]
*537 These being our views as to the intent and purpose of the chartering act, it remains to determine whether the Law Against Discrimination, as applied in the Division, conflicts with it. The test is whether the latter "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Hines v. Davidowitz, 312 U.S. 52, 67-68, 61 S.Ct. 399, 85 L.Ed. 581 (1941), quoted with approval in Perez v. Campbell, supra, 402 U.S. at 649-650, 91 S.Ct. at 1711; Florida Avocado Growers v. Paul, 373 U.S. 132, 141 (opinion of the court), 165 (dissenting opinion), 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963).
When the federal statute is seen as simply bestowing a national charter and not as embodying any substantive policy the asserted conflict becomes illusory. The New Jersey statute as applied does not vitiate the charter of incorporation; it merely regulates how Little League shall conduct its activities in the State of New Jersey in respect of exclusion of participants on the basis of sex. In this regard it may be noted that the charter's objects are required to be pursued "in all lawful ways." Note 2, supra.
The claim of preemption is also without merit. Where the state statute or regulation is an exercise of the state's police power, the settled rule is not to decree a federal displacement "in the absence of an unambiguous congressional mandate to that effect." Florida Avocado Growers v. Paul, supra, 373 U.S. at 146-147, 83 S.Ct. at 1219. Here, as seen above, the four federal charters mentioned by Little League cannot, for the reasons already stated, be said to be evidence of any particular substantive congressional policy (except, perhaps, encouraging patriotism and good citizenship). The enactment of these charters consequently does not reflect any national policy on the merits of limitation of membership in any organization to boys, and so there is absent any evidence of an unambiguous congressional intent to displace New Jersey laws and policies respecting discrimination as to places of public accommodation on account of sex, either generally, or as applied to Little League.
*538 We conclude that the order of the Division on Civil Rights is not invalid under the Supremacy Clause or principles of federal preemption.

V
Appellant contends that in any event the orders of the Division are too broad and restrictive. We think not. Understood, as they must be, solely with reference to Little League's activities in or affecting New Jersey and its residents, we do not find the orders broader than reasonably necessary to effectuate the admission of girls aged 8 to 12 to Little League activity. Neither Little League nor its chartered leagues in New Jersey need conduct baseball in this State. But if they do, on an invitation to the general public to participate, girls in the mentioned age bracket must be invited and admitted as freely and as unreservedly as are boys.
The provisions for enforcement embodied in the orders are within the permissible range of discretion of the Division and are designed to assure effectuation of the stated objectives. We do not find them unreasonable or arbitrarily burdensome. See Jackson v. Concord Co., 54 N.J. 113 (1969); Polk v. Cherry Hill Apartments, Inc., 62 N.J. 55 (1972).
Affirmed.
MEANOR, J.A.D. (dissenting).
It might be well to restate the issue. The question is not whether girls age 8 to 12 may be permitted to play hardball with boys of the same age group. Of course they can.
The issue is whether our Law Against Discrimination, N.J.S.A. 10:5-1 et seq., compels Little League to open its membership to girls age 8 to 12 over its vehement objection.
I agree with the majority in affirming the conclusion below that differences in athletic prowess between the sexes in this *539 age group are either nonexistent or minimal. Thus, the argument that girls of this age are more susceptible to injury in baseball than boys must be rejected, and with that rejection falls the conclusion that differences in the physical capacities of the sexes, at these age levels, provide a reasonable basis for sex segregation in Little League.
I need not discuss the preemption issue, nor struggle with the conceptual difficulties encountered in attempting to rationalize the Little League as a place of public accommodation as defined in N.J.S.A. 10:5-5(l). While I have substantial doubt that Little League is a "place of public accommodation" as defined in the statute, I will accept arguendo the majority's determination that it is.
Where the majority and I must differ concerns what I believe to be its misconstruction of the exceptions to the general bar of discrimination based on sex that are set forth in N.J.S.A. 10:5-12(f). Those exceptions are:
* * * provided, however, that nothing contained herein shall be construed to bar any place of public accommodation which is in its nature reasonably restricted exclusively to individuals of one sex, and which shall include but not be limited to any summer camp, day camp or resort camp, bathhouse, dressing room, swimming pool, gymnasium, comfort station, dispensary, clinic or hospital, or school or educational institution which is restricted exclusively to individuals of one sex, from refusing, withholding from or denying to any individual of the opposite sex any of the accommodations, advantages, facilities or privileges thereof on the basis of sex * * *.
If the Legislature meant to say that sexual discrimination can exist only where necessary to preserve privacy of the body, it could have said just that and did not need to list the string of exceptions to the general ban on sex discrimination that are set forth. I read the statute as (1) permitting any reasonable sex discrimination, and (2) providing, in addition, that in the listed categories sex discrimination may exist as a matter of right.
With respect to the exceptions, I see more than the one common theme of bodily privacy. There are at least two *540 others: (1) athletic competition, and (2) educational endeavors. Little League falls within both classes.
It is apparent that the congressional purpose in chartering Little League was to foster nonacademic education through the acquisition of skill at baseball. Undoubtedly it had in mind things such as physical fitness, the strength of character to be built from team competitive endeavor, and the self-discipline inevitably generated in developing the proper emotional attitudes about winning and losing.
The statute in question permits sexual but no other kind of discrimination at the places enumerated in the exceptions. See N.J.S.A. 10:5-5(l). Schools and camps, excepted categories, are most likely places for childhood athletic competition. It seems to me that Little League's activities are quite like the exceptions in which sexual discrimination is permitted and that it is more reasonable to place Little League within the exceptions than outside them. I do not mean to imply any doubt about the power of the Legislature to compel Little League to accept girls; it is simply that I do not believe that that power has been exercised. In fact, I doubt that sexual integration of athletic competition was considered at the time of enactment of the amendments which dealt with sex discrimination.
Furthermore, I think restriction of Little League to boys has a reasonable basis apart from any impact of the statutory exceptions to sex discrimination. There is virtual concession in this record that from puberty females cannot successfully compete with males in this contact sport. There may be a few isolated females of exceptional athletic ability who can, but for classification purposes they safely may be ignored. Generally, then, it will be true that females, after reaching adolescence, will be unable to capitalize upon baseball skills acquired during childhood unless they do so in all-female competition which is not now available. Males, on the other hand, may continue in the sport until the approach of middle age and perhaps thereafter. There is nothing unreasonable in the position of Little League in desiring not to teach girls *541 a skill that is only temporarily useful. And although there is no evidence on the point in this record, prima facie one may consider the impact upon the girl who devotes several years to baseball only to find that upon the onset of puberty she can no longer play. In short, it seems to me to be reasonable to have a policy which, considering today's available athletic resources, tends to channel female childhood sports into areas that will provide recreational skills susceptible of long-term enjoyment.
This case appears to be unique. There are several academic comments dealing with sex discrimination in athletics which discuss the available decided cases. Both the comments and the cases deal with equal protection issues which are not projected here. See, e.g., Stroud, "Sex Discrimination in High School Athletics", 6 Ind. L. Rev. 661 (1973); Note, "The Case For Equality in Athletics," 22 Cleveland St. L. Rev. 570 (1973); Note, "Sex Discrimination in High School Athletics," 57 Minn. L. Rev. 339 (1972), and the cases discussed therein. It appears that there is no other case involving, as does this one, the reasonableness of sexual discrimination in a body contact sport. But the inherent reasonableness of such segregation for those past puberty should not be obscured because of the lack of physical discrepancy at the immature ages here involved. Plainly, the Legislature did not mean to say that Little League is unreasonable in refusing to teach a skill only transiently useful. Accordingly, I would reverse the order of the Division on Civil Rights under review.
NOTES
[1] Dr. Torg cited a study by Marlene Andrian, "Sex Differences in Biomechanics," which concluded that coeducational physical education and athletic programs are feasible for elementary age and pre-pubic adolescent children. Morehouse, "The Scientific Basis of Athletic Training" (which was also cited by Dr. Hale) was read into the record for the proposition that physical performance of girls up to about 13 years of age is equal to that of boys and that thereafter the difference in athletic ability widens sharply.
[2] "Sec. 3. The objects and purposes of the corporation shall be 

(1) To promote, develop, supervise, and voluntarily assist in all lawful ways the interest of boys who will participate in Little League baseball.
(2) To help and voluntarily assist boys in developing qualities of citizenship, sportsmanship, and manhood.
(3) Using the disciplines of the native American game of baseball, to teach spirit and competitive will to win, physical fitness through individual sacrifice, the values of teamplay and wholesome well-being through healthful and social association with other youngsters under proper leadership." 78 Stat. 325 (1964); emphasis added.
[3] See, e.g., S. Rep. No. 1154, 88th Cong. (2d Sess. 1964).

"Over a period of years, the Little League Baseball organization has done a great deal to achieve widespread participation by American youth in the traditional game of baseball. Its program has done much to encourage physical fitness, to teach the value of team play, and to instill the spirit of sportsmanship.
Today, it is estimated that 1.25 million boys participate annually in Little League baseball. Little League has approximately 6,000 chartered local leagues all over the United States, with about 400 of these outside the United States. There are now almost 200 in Canada and there are leagues in Japan and in Australia.
The committee believes that the granting of a Federal charter would be an appropriate recognition of the national stature which Little League has attained and will encourage its further development, and accordingly recommends favorable consideration of this bill, H.R. 9234, without amendment."
[4] Congress has no explicit power to create corporations. The power exists only as a means, under the necessary and proper clause, to effectuate the powers expressly conferred upon the national government. M'Culloch v. Maryland, 4 Wheat. 316, 4 L.Ed. 579 (1819); see Fletcher, Cyclopedia Corporations, § 121 (1963). Since it is difficult to conceive of any express power underlying the congressional charter of incorporation for Little League Baseball, the charter is itself a tenuous exercise of federal power. Moreover, there being no underlying express power, the charter cannot be deemed intended to effectuate any substantive policy or purpose.