KIWANIS INTERNATIONAL, Plaintiff,

v.

RIDGEWOOD KIWANIS
CLUB, Defendant,

and

Julie Fletcher, Additional
Counterclaimant.

KIWANIS CLUB OF RIDGEWOOD,
INC. and Julie Fletcher, Plaintiffs,

v.

KIWANIS INTERNATIONAL,
Defendants.

Civ. A. Nos. 85–4306, 85–4483.

United States District Court,
D. New Jersey.

Feb. 6, 1986.

Hirsch, Newman, Simpson & Baer, Hackensack, N.J., for plaintiff.

Orbe, Nugent & Collins, Ridgewood, N.J., for defendant; Barnes & Thornburg, Indianapolis, Ind., of counsel.

## OPINION

SAROKIN, District Judge.

### INTRODUCTION

It is somewhat astonishing in the year 1985 to hear an officer of a well-known international organization (boasting more than 300,000 members) say that it is fine for women "to help make the pancakes" but not for them to be members of the organization sponsoring the sale of those pancakes.[1] The issue squarely presented by this case is whether such a blatant and admitted sexist attitude, and the discriminatory membership policy arising from it, are entitled to the protection of a United States District Court. For Kiwanis International asks this court to enjoin a local chapter from using the Kiwanis name and logo *solely* because that local has admitted a woman into its ranks.

---

1. Testimony of Gilbert Zitzelsberger, 11/18/85    at 168–69.

There can be no doubt that the right to free association permits certain groups to gather, organize and exclude from their midst anyone whom they choose, no matter how offensive or discriminatory the basis of such exclusion. However, that right of exclusion depends upon the nature of the organization, its size, its purposes, the method by which its members are selected, where and how it meets, the nature of the benefits, if any, that accrue from membership and any detriments from exclusion. As one moves along the spectrum from the purely private club or organization to the clearly public one, there comes a point where the state may declare that the individual's right not to be excluded on discriminatory grounds overrides the group's right to exclude and discriminate, no matter how strongly felt or clearly expressed that policy may be.

For the reasons hereinafter set forth, the court concludes that Kiwanis International is not entitled to the injunctive relief it seeks, because to grant such relief would condone, protect and encourage its avowed policy of discrimination against women in violation of the mandate of the New Jersey legislature. Whatever federally-based rights Kiwanis has to protect its trade name must be subject to the congruent state-based right of women not to be excluded from membership solely because of their sex.

## FINDINGS OF FACT

Commencing on November 18, 1985, the court held a hearing in this matter which the parties have agreed to treat as a consolidated preliminary and final hearing on their opposing requests for injunctive relief. Upon its review of the testimony and evidence presented at that hearing, the court makes the following findings of fact:

### I. *Kiwanis International and its Service Marks*

Kiwanis International is a non-profit corporation incorporated in Illinois with its headquarters in Indiana. The objectives of Kiwanis, as set out in its bylaws, are:

To give primacy to the human and spiritual, rather than to the material values of life.

To encourage the daily living of the Golden Rule in all human relationships.

To promote the adoption and the application of higher social, business and professional standards.

To develop, by precept and example, a more intelligent, aggressive, and serviceable citizenship.

To provide, through Kiwanis clubs, a practical means to form enduring friendships, to render altruistic service, and to build better communities.

To cooperate in creating and maintaining that sound public opinion and high idealism which make possible the increase of righteousness, justice, patriotism and good will.

(Plaintiff's Exhibit 15, Kiwanis const., art. II). To these ends, the International charters, supervises and controls local clubs throughout the United States and the rest of the world. These local clubs currently number about 8,200 worldwide, and have a membership of about 313,000. Although a collateral benefit of Kiwanis membership is the enjoyment of other members' company, the activities of Kiwanis are primarily civic and charitable, rather than social. Indeed, Kiwanis clubs in North America experience a sixty to seventy percent attrition rate in the first year for new members. (Testimony of Gilbert Zitzelsberger, 11/19/85 at 10). And while the precise scope of the locals' activities is not defined in the International's constitution or bylaws, those provisions place importance not on the social aspects of Kiwanis membership, but rather the community service projects and charity fund raisers to which the locals are expected to devote their primary energies. (Testimony of John P. Hansen, 11/18/85 at 59). During 1984, Kiwanians donated more than twenty-two million hours to community service projects and raised approximately forty-one million dollars. (Affidavit of Gilbert Zitzelsberger, 9/17/85 at 3).

Since its inception in 1915, Kiwanis has limited its membership to men. This limita-

tion is now embodied in the International's constitution (art. V, § 4(a)) and bylaws (art. II, § 2), which the locals are to follow as a condition to the retention of their charters (art. IV, § 2). The International has a number of other membership requirements, such as employment in a recognized trade or profession (testimony of Gilbert Zitzelsberger, 11/18/85 at 159), but none are such that women would be incapable of satisfying them. The issue of whether to admit women has been introduced at recent Kiwanis conventions, but has consistently been defeated by clear majorities of the delegates. (Testimony of Gilbert Zitzelsberger, 11/18/85, at 170). Women are active in the fund raising activities of the clubs, however, and are often present at club meetings as invited speakers and guests. (*Id.* at 166–69; testimony of John P. Hansen, 11/18/85 at 101). Women's participation in Kiwanis activities has even been formalized through the vehicle of "Kiwanianne" clubs, which consist principally of wives and widows of Kiwanis club members, but which may admit women not otherwise associated with Kiwanis. Kiwanianne clubs, which are sponsored and supervised by one or more local Kiwanis clubs, are permitted to use the Kiwanis name and service marks and to engage in the same service activities as the Kiwanis clubs with which they are affiliated, but their members may not vote or hold office in Kiwanis clubs. (Testimony of Gilbert Zitzelsberger, 11/19/85 at 11–15; affidavit of Stephen Lear, 10/15/85 at 4). Furthermore, Kiwanis sponsors Key clubs at the high school level and Circle K clubs at the college level, both of which are open to males and females. (Testimony of Gilbert Zitzelsberger, 11/19/85 at 11).

Kiwanis meetings are often held in public restaurants. Kiwanis has no secret rituals or meetings, and engages in no activities in which the presence of women would create uncomfortable or embarrassing situations. Indeed, since the formal objectives of Kiwanis are in no way sex-specific (testimony of John P. Hansen, 11/18/85 at 101), and since women already participate to such a significant degree in its activities (*id.*), their full membership will not adversely affect the camaraderie or the impede the achievement of any of the overall goals of the organization (*id.* at 107). Nor will the public's estimation of Kiwanis be adversely affected by the membership of women. (Testimony of Gilbert Zitzelsberger, 11/18/85 at 178). Persons who would otherwise contribute will not cease doing so because women are members (*id.*).

The International owns four service marks relating to the Kiwanis name. The marks are used by local clubs primarily to promote their services activities, and are also used to attract new members and to identify the locals to members of other Kiwanis clubs. The use of the service marks is central to the success of the locals' service and fund raising activities—indeed, to the locals' continued existence—because those marks inspire public confidence in the activities being promoted. (*Id.*, 11/18/85 at 177; affidavit of Stephen Lear, 10/15/85 at 6; testimony of Julie Fletcher, 11/18/85 at 150). Until 1985, locals were permitted use of the marks until their charters were suspended or revoked. In January of that year, however, the International amended its bylaws to provide that the locals possessed only a revocable, nonexclusive license to use the marks, and that such license would be automatically revoked on sixty days' notice upon violation of any of the provisions of the constitution or bylaws.

## II. *The Ridgewood Club*

In June of 1984, the Kiwanis Club of Ridgewood, New Jersey admitted a woman named Julie Fletcher. Ms. Fletcher is an art consultant, and therefore a member of a recognized trade or profession as required by the International's membership rules. Furthermore, she is willing to attend meetings consistently, and to pray and say the pledge of allegiance at them. In sum, she meets all of the criteria for membership except for gender. She has made beneficial business contacts as a result of her membership. (Testimony of Julie Fletcher, 11/18/85 at 149).

Upon admitting Ms. Fletcher, the club submitted to the International a "New Member Add Form" and processing fee, which the International promptly returned. Then, on July 26, 1985, the Secretary of Kiwanis International sent a letter to the Ridgewood club, stating that "It has been brought to our attention that your club has recently admitted a female member and has thus failed to comply with the provisions of Article II, Section 2 of the Kiwanis International Bylaws." The letter proceeded to notify the club that unless it cured the noncompliance in sixty days, its license to use the service marks would be revoked without further notification. When communications between counsel established that Ridgewood did not plan to eject Ms. Fletcher, the International filed this suit on September 3, 1985, claiming that Ridgewood had forfeited its license to use the Kiwanis service marks, and seeking preliminary and permanent injunctions prohibiting Ridgewood from using those marks. On September 6, 1985 Ridgewood and Ms. Fletcher filed a suit in New Jersey Superior Court requesting an injunction prohibiting the International from revoking Ridgewood's license on the basis of Ms. Fletcher's membership and a declaration that Ms. Fletcher is a bona fide member of Ridgewood. The International removed that suit to this court on diversity grounds on September 12, 1985, and the parties agreed to a consolidation on September 23. The International has moved to have the complaint filed by Ridgewood and Ms. Fletcher dismissed for failure to state a claim upon which relief may be granted, and both parties have moved for the injunctive relief outlined in their respective complaints.

## DISCUSSION

While the facts are largely undisputed, the parties have framed the legal issues in widely divergent terms. The International, on the one hand, casts it as a simple trademark infringement case, in which the court's limited function is to recognize the validity of its trademark rights, declare Ridgewood's infringement of them, and enjoin such further infringement. Fletcher and Ridgewood, on the other hand, assert that the trademark infringement action is merely a guise masking the real issue; namely, their claim that the International is engaging in illegal sex discrimination. Their disagreement complicates the court's disposition to some extent, because the analysis to be employed differs depending on whether either claim is presented as a cause of action or a defense. This, however, is largely due to the somewhat confusing nature of the precedent defining the interaction between state and federal law as they relate to the claims herein, rather than to any ambiguity as to the outcome. For whatever analysis is employed, the result is the same: the International's proprietary rights in its federal trademark are conditioned on Fletcher's state-created right to be free of discrimination. This conclusion is demonstrated most clearly by treating these two consolidated suits as if they were brought independently. The court will therefore conduct an independent analysis first of Ridgewood and Fletcher's discrimination claims as asserted in their complaint, and then it will do the same for the International's trademark claim.

### I. *The Anti-discrimination Suit*

The complaint filed by Ridgewood and Ms. Fletcher asserts that the International's attempt to withdraw the use of its service marks constitutes unlawful sex discrimination in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et seq.*, as well as the New Jersey Constitution, art. I, ¶ 1, and their counterclaim alleges further that this court's enforcement of such a discriminatory policy would constitute governmental action in violation of the equal protection provisions of the United States Constitution. Because the court finds the statutory claim a sufficient ground upon which to render a decision in this instance, it declines to address the constitutional claims.

The New Jersey Law Against Discrimination prohibits the operator of any "place of public accommodation" from denying the use of any of its "accommodations, advantages, facilities or privileges" on account of "race, creed, color, national origin, ancestry, marital status, sex or nationali-

ty", except, in the case of sex, where the place of public accommodation "is in its nature reasonably restricted exclusively to individuals of one sex." N.J.S.A. 10:5–12(f); *National Organization for Women v. Little League Baseball,* 127 N.J.Super. 522, 527, 318 A.2d 33, *aff'd mem.,* 67 N.J. 320, 338 A.2d 198 (1974). Fletcher and Ridgewood claim that the Kiwanis Club is a "place of public accommodation" within the meaning of that statute, and that any attempt to exclude women from it solely on the basis of their sex is therefore void for illegality. The International offers four arguments for rejecting this line of reasoning. First, the International claims that its attempt to enforce its trademark rights simply does not constitute sex discrimination. Second, it argues that Kiwanis does not come within the purview of the New Jersey Law Against Discrimination because that statute only applies to "places of public accommodation" which have spatial characteristics. Third, the International claims that Kiwanis is protected by the explicit exclusion for clubs that are "by their nature distinctly private". And finally, the International claims that the New Jersey Law Against Discrimination is preempted because its application impedes the International's free use of its federal trademark rights. The court will address each of these defenses in turn.

### A. *Discriminatory Intent*

As for the International's argument that its attempt to withdraw its trademark has nothing to do with sex discrimination, the court treats this as a matter of intent, and concludes that Ridgewood and Fletcher have the better of the argument. Although tactically impressive and creative, the International's argument that it does not seek to force Ms. Fletcher's ouster is totally disingenuous. In support of its argument for injunctive relief, Kiwanis urges the importance of its name and logo and what they have come to signify. By the International's own assertions, it is evident that the chapter without the right to use the name ceases to be a chapter at all. Ridgewood does not require the permission of the International to operate as a separate or different club. The undisputed fact is that without the right to use the Kiwanis name, the chapter's ability to function, survive and carry out its avowed purposes is or will shortly be at an end. The grand gesture by the International that the local can continue to be a renegade so long as it does not use the Kiwanis name is thus a gift box with nothing inside.

### B. *The Spatiality Requirement*

The International's next argument for nonapplication of the New Jersey Law Against Discrimination is that the statute only covers "places" that have predominately spatial characteristics. Because the court's jurisdiction is based on diversity, its function is to predict what the New Jersey Supreme Court's interpretation of this important statutory term would be. As an initial matter, the court looks to the definitional provision found in N.J.S.A. 10:5–5($l$ ), which is set out in the margin.[2] Because

---

**2.** "A place of public accommodation" shall include, but not be limited to: any tavern, roadhouse, hotel, motel, trailer camp, summer camp, day camp, or resort camp, whether for entertainment of transient guests or accommodation of those seeking health, recreation or rest; any producer, manufacturer, wholesaler, distributor, retail shop, store, establishment, or concession dealing with goods or services of any kind; any restaurant, eating house, or place maintained for the sale of ice cream, ice and fruit preparations or their derivatives, soda water or confections, or where any beverages of any kind are retailed for consumption on the premises; any garage, any public conveyance operated on land or water, or in the air, any stations and terminals thereof; any bathhouse, boardwalk, or seashore accommodation; and auditorium, meeting place, or hall; any theatre, motion-picture house, music hall, roof garden, skating rink, swimming pool, amusement and recreation park, fair, bowling alley, gymnasium, shooting gallery, billiard and pool parlor, or other place of amusement; any comfort station; any dispensary, clinic or hospital; any public library; any kindergarten, primary and secondary school, trade or business school, high school, academy, college and university, or any educational institution under the supervision of the State Board of Education, or the Commissioner of Education of the State of New Jersey. Nothing herein contained shall be construed to include or to apply to any institution, bona fide club, or place of accommodation, which is in its nature distinctly private; nor shall anything herein contained apply to any educational facili-

that provision, though detailed, provides no dispositive answer to the question whether the term "place" is limited to spatial phenomena, the court looks next to the relevant pronouncements of the New Jersey Supreme Court.

As a general matter, that court has established that the law is remedial and should be read with an approach sympathetic to its objectives. *See Levitt & Sons, Inc. v. Division Against Discrimination,* 31 N.J. 514, 524, 158 A.2d 177 (1960); *Zahorian v. Russell Fitt Real Estate Agency,* 62 N.J. 399, 409, 301 A.2d 754 (1973). More importantly, that court has expressly affirmed a decision by the Superior Court that "[t]he statutory noun 'place' is a term of convenience, not of limitation." *National Organization for Women v. Little League Baseball,* 127 N.J.Super. 522, 530, 318 A.2d 33, *aff'd mem.,* 67 N.J. 320, 338 A.2d 198 (1974). In that case, which was a suit against the Little League for denying girls the opportunity to participate in its activities, the Little League argued that the statute did not apply to "a membership organization which does not operate from any fixed parcel of real estate in New Jersey." *Id.* at 530, 318 A.2d 33. The court rejected that argument, concluding that the "place" requirement was satisfied by a showing that Little League's activities were primarily conducted in a public place; namely, the ball field "at which tryouts are arranged, instructions are given, practices held and games played." *Id.* at 531, 318 A.2d 33.

■ Thus, as the Minnesota Supreme Court explained when adopting the New Jersey court's holding to a fact pattern almost identical to the one now before this court, *Little League* stands for the proposition that "a 'place of public accommodation or a facility' is less a matter of whether the organization operates on a permanent site, and more a matter of whether the organization engages in activities in places to which an unselected public is given an open invitation." *United States Jaycees v. McClure,* 305 N.W.2d 764, 773 (Minn. 1981).[3] Because Kiwanis conducts its meetings in just such places,—i.e., public restaurants—the court concludes that the New Jersey Supreme Court would be as prepared to find that the statutory "place" requirement has been met here as it was in *Little League.*

### C. *The Private Club Exception*

With regard to the International's claim that Kiwanis is expressly excluded from the statute's coverage because it is a club "by its nature distinctly private", the court notes first that the provision in question was added as part of a 1977 amendment by which the legislature established that, to the extent permissible, clubs generally were to be viewed as clearly within the statute's purview. *See Hinfey v. Matawan Regional Bd. of Educ.,* 77 N.J. 514, 523, 391 A.2d 899 (1978). It would thus be directly contrary to the legislature's intent to exclude Kiwanis from the scope of the statute simply because it is a club. Rather, it is necessary to determine whether such a club is one that is so distinctly private that any interference in its admission policies would impinge on members' freedom of association in a manner that contravenes

---

ty operated or maintained by a bona fide religious or sectarian institution, and the right of a natural parent or one in loco parentis to direct the education and upbringing of a child under his control is hereby affirmed; nor shall anything herein contained be construed to bar any private secondary or post-secondary school from using in good faith criteria other than race, creed, color, national origin or ancestry, in the admission of students.

**3.** The International notes that a number of states' highest courts have not followed the Minnesota court's lead, and have instead concluded that their anti-discrimination laws do not pro-

hibit the kind of discrimination that is engaged in by all-male clubs. *See e.g., United States Jaycees v. Massachusetts Comm'n Against Discrimination,* 463 N.E.2d 1151 (Mass.1984); *United States Jaycees v. Bloomfield,* 434 A.2d 1379 (D.C.App.1981); *United States Jaycees v. Richardet,* 666 P.2d 1008 (Alaska 1983). Given the New Jersey Supreme Court's clear instruction to construe its antidiscrimination statute liberally, however, and given its affirmance of *Little League,* 67 N.J. 320, 338 A.2d 198 (1974), the court concludes that the Minnesota Supreme Court's interpretation is more in keeping with the New Jersey court's viewpoint.

the United States Constitution. It is to that issue that the court will now turn.

The United States Supreme Court has recently given significant guidance on the freedom of association issue in a case much like the one now before this court. In that case, *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), the Court held that there is no violation of the freedom of association in a Minnesota anti-discrimination statute which prohibits the United States Jaycees from excluding women on the basis of sex. In reaching this conclusion, the Court noted first that the constitutional term "freedom of association" actually encompasses two distinguishable interests; the "freedom of intimate association" and the "freedom of expressive association". Eschewing any rigid standard for invalidating a state anti-discrimination law that prohibits an organization from engaging in discriminatory admission practices, the Court explained that a number of factors are relevant to such a determination. This court evaluates the situation before it in light of those factors.

With regard to the constitutional right to intimate association, the Supreme Court explained that "because the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State." *Id.* 468 U.S. ——, 104 S.Ct. at 3250 (1984). The court then advanced a number of characteristics distinguishing such relationships, including "relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Id.* Thus, factors that might be relevant in identifying such a situation include, but are not limited to, "size, purpose, policies, selectivity, [and] congeniality." *Id.*

Throughout the hearing in this matter, Kiwanis continually adverted to facts which suggested that its membership is highly selective and that members participate in the organization's activities for reasons of camaraderie. Testimony indicated, for example, that Ridgewood has admitted no more than twenty members in the past ten years, and that individuals are not invited to join Kiwanis unless they are sponsored by someone who is already a member of the club. Furthermore, testimony established that ten of the twenty-eight members of Ridgewood Kiwanis have been with the club for more than twenty years. Finally, there exist a number of local membership requirements imposed in tandem with the International's rules, such as a willingness to attend meetings consistently, a willingness to pray and say the pledge of allegiance at meetings, and membership in a recognized trade or profession.

█ A consideration of all the relevant aspects of the Kiwanis organization, however, shifts the balance in quite the opposite direction. As noted above, the organization in its entirety has 8,200 locals and a worldwide membership of 313,000, and Kiwanis clubs in North America experience a seventy-five percent attrition rate in the first year for new members. When viewed in such broad range, these characteristics fit ill with the concept of intimacy that the Court clearly intended to emphasize in *Roberts*. Furthermore, testimony established repeatedly that the primary function of is not to promote camaraderie among its members, but rather to perform charitable service to the community. While creating a sense of comradeship is certainly a secondary goal of Kiwanis, and while that goal is as laudable and significant in that organization as it is in any communal effort that individuals choose to undertake, it is not the *sine qua non* of Kiwanis' existence. In any event, the ex-president of the Ridgewood Club testified that neither the comradeship of that club's members nor the club's overall charitable goals would be adversely affected in any way by the admission of women. This testimony was reinforced by evidence which established that the formal objectives of are in no way sex-specific, and that in clubs throughout the country women are often present at meetings and participate closely with the male members in the organization's chari-

table activities[4]. Indeed, the only activities from which women are apparently excluded are office-holding and participation in Kiwanis clubs' primary decision-making processes. In light of all these factors, the court must conclude that Kiwanis lacks the distinctive indicia of intimate association that might afford constitutional protection to its members' decision to exclude women. *Roberts*, 468 U.S. ——, 104 S.Ct. at 3251.

Having so concluded, the court must next determine whether application of the New Jersey statute infringes on the male members' related freedom of expressive association. As the Supreme Court explained in *Roberts*, the freedom to engage in collective activity is a necessary correlative to the freedom to speak, to worship, and to petition the Government for the redress of grievances, because membership in a group may not only be essential to the individual's clarification and articulation of ideas different from those of the majority, but may also provide the necessary support for the continued expression of dissident ideas in the face of the majority's disapproval. *Id.* at ——, 104 S.Ct. at 3252. Indeed, because the strength of one's voice is often dependent on the extent to which one believes it will be echoed by others of like mind, "there can be no clearer example [of an infringement of the freedom of expressive association] than a regulation that forces the group to accept members it does not desire." *Id.* Nonetheless, countervailing concerns require that there be limits on the parameters of this particular constitutional protection. "Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.*

Like the Minnesota statute at issue in *Jaycees*, the New Jersey Law Against Discrimination reflects its state's strong historical commitment to eliminating discrimi-

nation. *See Fraser v. Robin Dee Day Camp*, 44 N.J. 480, 485–86, 210 A.2d 208 (1965); *Levitt & Sons v. Division Against Discrimination*, 31 N.J. 514, 524, 158 A.2d 177 (1960). Such a concern is one that the Court has deemed a state interest "of the highest order." Here, even more so than in *Roberts*, the issue at hand is one which has serious social and personal implications. For the matter to be determined is whether an organization which purports to—and indeed does—embody and encourage the most communitarian and charitable of social activities should be permitted to impart the message that simply because one is female she is rightfully prohibited from functioning as a decisionmaker of full stature in the structuring of such activities. This case epitomizes the kind of situation where "discrimination based on archaic and overbroad assumptions about the relative needs and capacities of the sexes forces individuals to labor under stereotypical notions that often bear no relationship to their actual abilities." *Roberts*, 468 U.S. at ——, 104 S.Ct. at 3253. The operation of such assumptions disserves both the individual who is the object of the discrimination by belittling her personal worth and dignity, and the society of which she is a part by denying it the benefit of her full contribution.

Thus viewing the nature of the harm sought to be prevented, the court next looks to whether New Jersey's Law Against Discrimination has done so in a sufficiently nonrestrictive way. As noted above, the testimony in this case established repeatedly that women's full participation in clubs as they exist today would do little to inhibit male members' freedom to express themselves as they currently do, since women are already permitted to participate in almost all of the activities in which such expression may occur. As for the possibility that women may use their membership to influence the organization's

---

**4.** Gilbert Zitzelsberger, the Secretary of Kiwanis International, did express the fear that if Kiwanis were required to take in women in the United States, it might lose a substantial portion of its membership in Europe. The court has made no findings of fact as to that claim, because it finds such a matter irrelevant to its disposition of the constitutional freedom of association issue at hand, and the fear was not supported by any competent evidence.

decisionmaking activities to institute a new agenda, the Supreme Court has made clear that absent some clear factual support, such an assertion is simply too speculative a ground on which to base a constitutional claim of the kind asserted here. *Id.* 104 S.Ct. at 3255. But even if such an abridgement of male-oriented expression could be found to occur, the legislation is no more invasive than necessary to promote the state's legitimate goal of eliminating discriminatory exclusion from participation in civic and charitable causes and assuring the advantages which accrue from Kiwanis membership. Indeed, this court cannot conceive of any other means to afford women all of the benefits of Kiwanis membership—including the right to vote and hold office—than to require that they be permitted to be members.

The court thus concludes that the New Jersey Law Against Discrimination applies consistently with the constitutional precepts articulated by the Supreme Court to bar the discriminatory policies that Kiwanis seeks to enforce by its withdrawal of the Ridgewood service mark, and further finds that Kiwanis is a place of public accommodation under the statute predicated upon the findings of fact set forth above. This having been determined, the court turns finally to the argument advanced most vociferously by the International; that the New Jersey Law Against Discrimination must nonetheless be precluded from operating because the state's legislated interest in so discouraging discrimination is preempted by the national interests embodied in the trademark laws.

### D. *International's Preemption Defense*

It is inevitable in any dual system of government that the laws issued by one of the two governing entities will from time to time come into conflict with those of the other. When such occurs in this nation's federalist system, the supremacy clause, U.S. Const. art. VI, cl. 2, provides a simple resolution; federal law must preempt inconsistent state law. Application of this precept may, however, be somewhat less than simple in a given instance. On the

one hand, the courts are to invalidate not only expressly conflicting state laws, but also those which more indirectly "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941), *quoted in Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 141, 83 S.Ct. 1210, 1216, 10 L.Ed.2d 248 (1963). On the other hand, preemption doctrine is not to be applied so heavy-handedly as to deter the states from enacting all worthwhile legislation simply because it relates tangentially to some federal law. Indeed, because the states' significant lawmaking authority cannot be preserved without a presumption "that Congress did not intend to displace state law," *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981), preemption is disfavored "in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." *Chicago & North Western Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981); *Florida Lime & Avocado Growers, supra,* 373 U.S. at 142, 83 S.Ct. at 1217.

With these principles in mind, the court turns to the particular arguments on which the International bases its preemption claim. Unable to point to any direct conflict between the Lanham Act and the New Jersey Law Against Discrimination, the International argues that there is nonetheless preemption for two distinct reasons. First, it claims that Congress expressly articulated an intention to occupy the entire field of trademark law. Second, it argues that operation of the New Jersey Law Against Discrimination would effectively contravene the policies behind the trademark laws by permitting a confusing trademark to operate.

The International's first argument may be disposed of in short order, for the Third Circuit expressly held in *Marinello v. Shell Oil Co.,* 511 F.2d 853, 857 (3d Cir. 1975), that Congress did not intend the

Lanham Act to occupy the entire field of trademark law. *Cf. National Organization for Women v. Little League Baseball,* 127 N.J.Super. 522, 534, 318 A.2d 33, *aff'd mem.,* 67 N.J. 320, 338 A.2d 198 (1974). Because the confusion argument was not directly presented in that case, the court will deal with it in more detail here. According to the International, operation of the New Jersey Law would require New Jersey Kiwanis clubs to admit women, thereby creating nonuniform admissions policies among the Kiwanis clubs of the various states. The consequence of this, the argument goes, will be bewilderment about the meaning of the Kiwanis mark in the mind of the public in general, and particularly for out-of-state Kiwanis members who pay visits (as is the practice) to a nondiscriminatory club. The answer to this argument is: nonsense!

Whatever surprise or confusion may exist can be easily dissipated in the first newsletter sent to members advising them of the results of this litigation. Furthermore, the suggested vision of a member visiting another chapter clutching his heart and gasping for air at the sight of a woman is pure fantasy. The evidence presented indicates that Kiwanis meetings are regularly held at public restaurants where women regularly dine. As this opinion has already noted, women are frequently in attendance as guests and speakers at the meetings themselves. Women regularly participate with members in fund raising activities, and there are no reported instances of any male members fainting as a result. Indeed, because women's presence is already so pervasive, Kiwanis cannot point to a single traditional activity which will be impeded, harmed or conducted any differently by granting women full membership. The court therefore concludes that the danger of confusion which the

International so fervently alleges is simply nonexistent.

Furthermore, even if some potential confusion about the nature of Kiwanis membership were to be created by application of the New Jersey Law Against Discrimination, the relative weight of the state and federal interests implicated here militates against a finding of preemption. *See Florida Lime & Avocado Growers,* 373 U.S. at 146, 83 S.Ct. at 1219. The Lanham Act does express, to be sure, a congressional design to promote national uniformity in the meaning of trademarks. *See Marinello v. Shell Oil Co.,* 511 F.2d 853, 858 (3d Cir.1975). It is not the case, however, that this federal interest is triggered whenever a trademark or service mark owner is forced to modify its activities in some way to comply with state regulations.[5] For Congress' underlying interest was not in eliminating every tangential or gratuitous form of public confusion that might accrue to a registered service or product. Rather, its specific concerns were with "securing to the owner the good will of his business and protecting the public against spurious and falsely marked products." S.Rep. No. 1333, 79th Cong.2d Sess. 1, *reprinted in* 1946 U.S.Code Cong.Serv. 1274. No actual threat to either of these congressional concerns exists here. First of all, testimony repeatedly established that any concern about public deception is misplaced here because the "service" being offered by Kiwanis—that is, its charitable activities—simply will not be altered in any way by the full membership of women. And as for Congress' desire to protect the mark owner's "reputation and good will *id.,*" testimony established that there exists no threat to such interests here since the public's tendency to contribute to Kiwanis causes will not diminish by the induction of wom-

---

**5.** As the Third Circuit explained in *Marinello,* 511 F.2d at 858:

> [O]nce the state court has declared a clause invalid as violating the public policy of the state, a federal court may not enforce such a term solely because a contract entails the licensing of a federally protected trademark. Thus, Shell could not insert in its dealer agreement or lease a clause otherwise unen-

forceable under state law—such as a disclaimer of warranty, a forfeiture, or a usurious interest rate—and then assert a right to enforce such provision based on its status as a registered trademark owner. And this is so even though the freedom of a trademark holder to dictate the terms of its licensing arrangement would thereby be curtailed to some degree.

en. In sum, the particular confusion against which the International seeks so fervently to guard against is not one which implicates any significant federal concern [6].

■ Furthermore, the federal interest in uniformity of trademarks, such as it is, is tempered in this case by the fact that the private ends being sought are invidiously discriminatory. As the Supreme Court recently pointed out, "[i]nvidious private discrimination ... has never been accorded affirmative constitutional protection," *Hishon v. King & Spalding*, 467 U.S. 69, 78, 104 S.Ct. 2229, 2235, 81 L.Ed.2d 59 (1984), and indeed Congress itself has acted to eliminate such discrimination in many aspects of private activity. *See, e.g.*, Title VII of the Civil Rights Act of 1964, 78 Stat. 241, as amended, 42 U.S.C. §§ 2000e *et seq.* In addition, the Supreme Court has held that when the states choose to supplement federal anti-discrimination laws, the effects of the states' efforts are not to be nullified by mere reference to "uniformity" in matters of federal concern such as interstate commerce. *See Colorado Anti-discrimination Comm'n v. Continental Air Lines*, 372 U.S. 714, 721, 83 S.Ct. 1022, 1025, 10 L.Ed.2d 84 (1963). In sum, it would do violence to the delicate balance of power struck by the supremacy clause to hold that the tangential federal interest in trademark uniformity preempts the principled state interest in eliminating discrimination which is at issue here. The court therefore rejects the International's preemption defense and holds that any attempt on its part to enforce its discriminatory policies in New Jersey, including the revocation of its service mark license from nondiscriminatory clubs, violates the New Jersey Law Against Discrimination.

### E. *The Remedy*

Having concluded that the International's attempt to withdraw the use of its trademark violates the New Jersey Law Against Discrimination, the court must fi-

nally determine whether an injunction against the International is warranted. The court's analysis establishes the illegality of the International's enforcement of its discriminatory membership policies. The court therefore grants Ms. Fletcher and Ridgewood's request for an injunction and declares that the International acted illegally by withdrawing the license of its service mark in an attempt to enforce its sexually discriminatory membership policies.

### II. *The International's Trademark Suit*

Having conducted the first part of its analysis in conformity with the allegations of the complaint asserted by Fletcher and Ridgewood, the court now evaluates the International's trademark claim not as a preemption defense but rather as a cause of action for trademark infringement in the first instance. The International's complaint alleges that once Ridgewood's license to use the Kiwanis service marks was revoked on September 25, 1985, its continued use of those marks constituted an infringement of the marks in violation of the Lanham Act, 15 U.S.C. § 1114. The complaint further requests relief in the form of a declaratory judgment under 28 U.S.C. § 2201 and an injunction against Ridgewood's continued use under 15 U.S.C. § 1116.

In order to prevail in a Lanham Act claim, a plaintiff must establish that it owns a validly registered and legally protectible service mark which the defendant is using without consent and in a manner which is likely to cause confusion. 15 U.S.C. § 1114; *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 137 (3d Cir.1981); *Kinark Corp. v. Camelot, Inc.*, 548 F.Supp. 429, 441 (D.N.J.1982). The International claims, and Ridgewood does not dispute, that the International is the owner of the service marks in question, and that those marks are currently reg-

---

**6.** The International correctly points out that as owner of the service marks in question, it is normally master of their meaning. While such would indeed be the case if this dispute were merely a simple contract action, a more detailed evaluation of the actual threat of confusion, and the public harm that might flow from it, is in order when the claim is that a state's law is the source of the confusion and therefore should be invalidated on supremacy clause grounds.

istered and uncontestable. Nonetheless, the analysis must once again expand to encompass the underlying issue of the International's discriminatory motive. The point where it does so is the context of the statutory term "consent", for as the court has noted above, the marks were until recently used pursuant to a licensing agreement, and the license was revoked as a direct result of Ridgewood's refusal to comply with the International's discriminatory policies. Ridgewood argues that a revocation of its license on such a ground is unenforceable because such agreements to discriminate are unlawful under the New Jersey Law Against Discrimination. The International maintains, however, that Ridgewood and Fletcher's assertions as to the legal effect of New Jersey law as a defense to its trademark claim are untenable because state law simply does not apply to agreements to license federal trademark rights. Thus, the very determination of the parties' relative rights with regard to use of the trademark in question depends in some degree on the applicability and effect of New Jersey's anti-discrimination law.

## A. The Applicability of State Law [7]

It has long been recognized that it is appropriate to fill in the interstices in federal law by looking to the applicable legal principles of the states. See, e.g., De Sylva v. Ballentine, 351 U.S. 570, 580, 76 S.Ct. 974, 979, 100 L.Ed. 1415 (1956) (adopting state rules governing domestic relations in defining the term "children" in Copyright Act); Automobile Workers v. Hoosier Cardinal Corp., 383 U.S. 696, 706, 86 S.Ct. 1107, 1113, 16 L.Ed.2d 192 (1966) (holding that state law defines statutes of limitations for breach of contract cases under federal labor law); Reconstruction Finance Corp. v. Beaver County, 328 U.S. 204, 66 S.Ct. 992, 90 L.Ed. 1172 (1945) (adopting state law definition of "real property" in interpreting Reconstruction Finance Corporation Act); American Well Works Co. v. Layne & Bowler Co., 241 U.S. 257, 260, 36 S.Ct. 585, 586, 60 L.Ed.

987 (1916) (finding that state law governs issue whether there has been slander of a patent); T.B. Harms Co. v. Eliscu, 339 F.2d 823, 827 (2d Cir.1964) (concluding that state law controls in actions to enforce or rescind assignments of copyrights); see also Jameson v. Bethlehem Steel Corp. Pension Plan, 765 F.2d 49, 52 (3d Cir.1985) ("[T]he fact that in deciding the federal cause of action the court is required to look to state law for the rule of decision is neither exceptional nor unusual."). As the Supreme Court pointed out in De Sylva, reliance on state law is particularly appropriate when the federal law in the area is latent or nonexistent and when the issue is one so traditionally of state concern that state law is well developed and therefore easily discernible. Id. Reference to state law in such instances is born of the practical necessity which arises out of a federalist system in which the federal courts' jurisdiction is primarily limited to matters relating to constitutional and federal statutory rights, while the state courts have primary responsibility for, and therefore expertise in, matters traditionally arising out of the common law. See Wallis v. Pan American Petroleum Corp., 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966) (quoting Hart & Wechsler, The Federal Courts and the Federal System 435 (1953) ("Congress acts ... against the background of the total corpus juris of the states."). Contract law is certainly one of those areas in which the state courts have superior expertise. See Marinello v. Shell Oil Co., 511 F.2d 853, 858 (3d Cir. 1975). Given that the terms of so typical a contract as a licensing agreement would easily be amenable to interpretation under state law, and given the fact that the Lanham Act does not by its terms give any direction as to the proper manner of interpreting such a contract, it would appear self-evident that the proper procedure would be to interpret that agreement by reference to state law. See Friendly, In Praise of Erie—And of the New Federal Common Law, 39 N.Y.U.L.Rev. 383, 410 (1964).

---

7. It is not contested that if state law applies, the governing law is that of New Jersey. See Mari-

niello v. Shell Oil Co., 511 F.2d 853, 856 n. 15 (3d Cir.1975).

■ The International nonetheless argues that this court should ignore the well developed state law in this area and initiate the development of a federal common law (according to which its withdrawal of its license should be found permissible, of course) because to do otherwise would pose a significant threat to the federal interests embodied in the Lanham Act. Specifically, it claims that the uniformity of trademarked products and services which the Lanham Act seeks to protect would be subverted without a federal common law for trademark licenses. The unsoundness in this argument becomes apparent, however, once it is noted that in this very instance the "uniformity" which the International seeks to protect—the all-male quality of Kiwanis clubs—is nowhere apparent in the federal trademark register. Thus, that particular element of the Kiwanis marks' meaning exists simply by reason of the mutual agreements between the International and the locals to condition the use of the service marks on the maintenance of discriminatory policies. Where the owner of a trademark engages in private lawmaking in the form of a contract, the terms of that contract will control, permitting a trademark to be privately leased or otherwise bargained away for reasons of mutual consent which have nothing whatsoever to do with the good will of the business originally embodied by the mark. *See* 1 J. McCarthy, Trademarks and Unfair Competition § 318.44 (1984).[8] Once the definition of the trademark becomes so distinctly a matter of private negotiation, the federal interest in uniformity becomes so tangential that it would be ludicrous to require the creation of an entire body of federal rules in order to protect that interest. Since the court fails to perceive any persuasive justification for engendering a federal common law for trademark licenses, it concludes that New Jersey law applies to the parties' dispute about whether the International's revocation of the Kiwanis trademark licensing agreement was valid.[9]

### B. *The New Jersey Law Against Discrimination*

■ Having determined that New Jersey law applies as the rule of decision regarding the International's revocation of its licensing agreement with Ridgewood, the court concludes further that New Jersey law requires it to decline to recognize the validity of that revocation. For as has been established by Part I of the analysis herein, one aspect of that state's law—the New Jersey Law Against Discrimination—prohibits the discriminatory policies on

---

8. Federal trademark law does require that the owner of a trademark maintain some uniformity in the meaning of the mark, else it be rendered meaningless through dilution. Aside from this particular requirement, which is not implicated here because the service performed by Kiwanis will remain the same whether women are members or not, the terms of trademark licenses are essentially evaluated according to basic contract principles. 3 R. Callmann, Unfair Competition § 19.48 (1983); *see, e.g., Parkway Baking Co. v. Freihofer Baking Co.,* 255 F.2d 641, 645 (3d Cir.1958); *Vargas v. Esquire, Inc.,* 164 F.2d 522, 526 (7th Cir.1947).

9. The court finds no inconsistency between this conclusion and the holding in *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134 (3d Cir.1981). In that case, the Third Circuit upheld the United States Jaycees' right to an injunction against the use of its service marks by a local whose charter had been revoked five years beforehand because it had admitted women. First of all, the court's analysis was premised on the initial determination that the license between the local and the National had long been terminated, and therefore that the matter of the National's motive was no longer relevant. Thus accepting as given the validity of the revocation, the court limited its consideration to the likelihood of confusion and the existence of a secondary meaning in the local's continuing use of the marks. Here, by contrast, the evidence surrounding the termination of the license—particularly the International's letter explicitly informing Ridgewood that termination would occur because of its decision to admit Fletcher—places the issue of the International's intent squarely before this court. Secondly, whereas the defendant local in *Philadelphia Jaycees* failed to offer any persuasive legal justification for analyzing the National's motives, Fletcher and Ridgewood present the court with a state anti-discrimination law which relates directly to that issue.

which the licensing agreement is conditioned, and indeed on which the revocation is based. And New Jersey gives effect to its statutory prohibitions not only when they are presented as grounds for a cause of action, but also when they are asserted in order to invalidate private contracts which fail to comply with such prohibitions. *See Shell Oil Co. v. Marinello*, 63 N.J. 402, 307 A.2d 598 (1973), *cert. denied*, 415 U.S. 920, 94 S.Ct. 1421, 39 L.Ed.2d 475 (1974).

Having so concluded, the court must finally determine the legal effect to be given to a contract with such a flawed provision. Under basic contract principles, the court is presented with the option of voiding the entire licensing agreement or simply reforming it to exclude the repugnant provision. Because the service mark would continue to have essentially the same meaning if licensed under an agreement modified only by the deletion of the repugnant provision, the court concludes that such provision does not go to the heart of the contract and therefore chooses the less drastic option of reformation. The licensing agreement thus stands, absent the illegal provision, and the parties may continue to rely on the rest of its provisions for the proper rules regulating their conduct with regard to the use of the marks. Accordingly, the motions of Kiwanis to dismiss and for injunctive relief are denied.

Defendant-counterclaimant Ridgewood and counterclaimant Fletcher are directed to submit an order appropriate to this court's holdings in Parts I and II of this opinion.

## CONCLUSION

To suggest that this case involves solely the right of Kiwanis to protect its name and logo because of a violation of its constitution or bylaws is to ignore reality. What is truly at issue here is whether Kiwanis can, directly or indirectly, enforce its policy of discrimination against women with the imprimatur of this court. This opinion concludes that it cannot. Kiwanis' trademark rights are subject to the right of women to be free of discrimination, as indeed they should be.

A membership sign of "Men Only" can be as offensive and repugnant as the sign "Whites Only".[10] Before this court exercises its equitable powers to enforce such a discriminatory policy, the need and justification for such a policy should be manifestly clear. The court does not mean to suggest by this opinion that there are no circumstances under which a group of men could form a private club or organization and exclude women. But anything which perpetuates and furthers discrimination against women contrary to state law should be carefully scrutinized, and sustained only when the particular and unique circumstances warrant. Here, and by this policy, the members of Kiwanis have excluded their own wives, daughters, sisters, mothers, and their business and professional colleagues. What is it that renders them all unsuited or unqualified to formally participate in the meetings, labors and good works of Kiwanis?

To permit women to become members of Kiwanis harms no one; to prohibit women from becoming members harms us all. The Kiwanis name will not suffer by their inclusion; indeed, it probably suffers more from their exclusion. The time has come, at least in New Jersey, for Kiwanis to permit women to do more than make pancakes.

---

**10.** "... [W]e still wonder at the stolid incapacity of all men to understand that woman feels the invidious distinctions of sex exactly as the black man does those of color, or the white man the more transient distinctions of wealth, family, position, place and power; that she feels as keenly as man the injustice of disenfranchisement." Elizabeth Cady Stanton, Susan B. Anthony, Mathilda Gage, History of Women Suffrage, Vol. I (1881).